TITUS et al. v. UNITED STATES SMELTING, REFINING & MINING
EXPLORATION CO. et al.

(Circuit Court of Appeals, Second Circuit.   March 13, 1917.)

No. 175.

1. CORPORATIONS ⬳574—USURY ⬳18—CONTRACTS—LOANS.

A majority of the bondholders of a corporation, whose assets consisted of the capital stock of mining companies, deposited their bonds with a committee to be used in carrying out any reorganization plan they might approve.  The committee entered into a contract with defendant mining corporation, by which the latter agreed to advance money for reorganization purposes and to expend not exceeding $200,000 in exploration of the mining property.  Defendant, which was to be the judge of the manner and extent of the appropriation, was to be secured by a pledge of all the the property of the corporation being reorganized, which the committee agreed to buy in at foreclosure sale.  The bondholders, who were not notified of the contract with defendant, approved a plan submitted to them authorizing the committee to organize a new corporation and to create prior liens, not to exceed $300,000, for any purpose which the committee in its uncontrolled discretion should deem wise or necessary for the protection or development of the property.  Defendant was not engaged in the business of lending money, and refused to make a loan to the committee for exploration purposes, but consented to make explorations on condition that it should receive a percentage of the stock in the company to be formed, and also agreed to discharge certain liens on the property.  *Held*, that the contract with defendant, though it provided for issuance to defendant of stock to a par value greatly in excess of the advances, was not usurious, there being no loan on which any were primarily liable, defendant being entitled to look to the property alone for reimbursement, and hence, though the contract was invalid, defendant's lien cannot be attacked on the ground of usury.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2297–2303; Usury, Cent. Dig. §§ 31–34, 36–38, 40.]

2. CORPORATIONS ⬳574—REORGANIZATION—LIEN.

In such case, defendant cannot be denied a lien for expenditures made in satisfying the claims of counsel, who conducted litigation on behalf of the corporation; such counsel fees being declared by the court in receivership proceedings to be an underlying lien on the corporate property.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2297–2303.]

3. CORPORATIONS ⬳574—LIENS—RIGHT TO.

In such case, as the reorganization committee had the right to obligate itself for the expenditure of necessary sums to protect and develop the property, defendant, having done exploration work pursuant to the contract with the committee, is entitled to a lien, and cannot be restricted to the rights of an occupant who, under a mistaken claim of title, makes improvements in good faith, in which case he is entitled only to the enhanced value of the land occasioned by the improvements.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2297–2303.]

Appeal from the District Court of the United States for the Southern District of New York.

Suit by Edward H. Titus and others, as executors, and others, against the United States Smelting, Refining & Mining Exploration Company and others.   From the decree (231 Fed. 205), complainants appeal.   Affirmed.

The United States Smelting, Refining & Mining Exploration Company is a corporation organized and existing under the laws of the state of Maine and had an office for the transaction of business in the Southern district of New York. It is hereinafter referred to as the Exploration Company. The Alaska-Ebner Gold Mines Company is a holding company organized in 1906 under the laws of the state of Maine. It is hereinafter referred to as the Alaska Company.

Otto C. Wierum, Jr., Thomas Mills Day, and Fredric W. Frost, all of New York City, for appellants.

Wing & Russell, of New York City (Philip Russell, of New York City, of counsel), for appellees.

Before COXE, ROGERS, and HOUGH, Circuit Judges.

ROGERS, Circuit Judge. This is an appeal from a decree directing a sale of certain shares of stock to satisfy a lien of the defendants, previously fixed by an interlocutory decree at the sum of $438,926.98. The complainants are bondholders of the Alaska Company who had deposited their bonds under a reorganization agreement.

The suit is ancillary to a suit brought in the District Court for the Southern District of New York, in which the Guaranty Trust Company of New York and Edward M. F. Miller, as trustees, are complainants, and Alaska-Ebner Gold Mines Company and others are defendants. It is brought to enforce the complainants' equitable claims to certain personal property, shares of stock, and to remove incumbrances or liens upon the title asserted by defendants thereto. It seeks to set aside certain contracts and to compel defendant to surrender certain shares of stock, which the defendant claims to have a lien on, to a receiver to be appointed for the benefit of the complainants, and for certain other relief which will be hereafter stated. The case cannot be understood without a pretty full statement of the facts.

The Alaska Company passed into the hands of receivers appointed on April 4, 1912, on a creditors' bill in equity in the United States District Court for the Southern District of New York, and on June 29, 1912, an ancillary receiver in Alaska was appointed. A bondholders' protective and reorganization committee was formed, with one E. R. Chapman as chairman. This committee is hereinafter referred to as the committee. The position of the bondholders was not secure under the mortgage, because the property mortgaged, to wit, Ebner stock, was to a large extent in the hands of prior lienors. Those liens are referred to as the underlying liens, and cover approximately 68 per cent. of the Ebner stock.

The committee needed money to take up the underlying liens and engineers to explore and develop the Ebner property. If that property was a mine, or could be made a mine, then there was value in the stock, which was the bondholders' security. If it were not a mine, or so long as it was undeveloped, their bonds were without value. This committee held a large number of the securities of the Alaska Company, and on December 19, 1912, they issued what is known as "Circular No. 1" to the bondholders of that company. The circular stated the assets and liabilities of the Alaska Company and its negotiations with

defendant, with a view of interesting it in the properties of the company, and that the defendant under certain conditions would become interested in the development of the property. The circular said:

"If the ore deposits are found to warrant it, they will provide the capital necessary to develop the mine and install the necessary stamp mills and other facilities for a large operation. The estimated amount required for this latter purpose is from $2,000,000 to $2,500,000."

It concluded with certain recommendations, which included the formulation of a plan of reorganization, to be prepared by the committee, and it requested a deposit of bonds with the Hudson Trust Company of New York City, subject to the order of the committee, with authority to the committee to use the same in connection with any plan of reorganization the committee might decide on, and also to use the same in any foreclosure proceeding that might be commenced, and in connection with such proceedings to use the same in purchasing at foreclosure sale—

"it being intended that the committee is to have the right and authority to use bonds deposited in every way as if they were the owners of the same, accounting to depositors in par of bonds of a reorganized company, or of a new company in case of foreclosure for the face value and accrued interest on the bonds deposited."

The committee on September 11, 1913, formulated a plan and entered into an agreement with the bondholders as parties of the second part and the Hudson Trust Company as depository party of the third part. This agreement, among other things, authorized the committee—

"to bid for and purchase at private sale or at judicial or other sales the whole or any part of the property and franchise of the company, to use any or all of the bonds deposited hereunder or held by the committee in payment of all or any part of the purchase price of the property so acquired, to hold the property purchased either in their name or in the name of any individual or corporation chosen by them for the purposes thereof, and at, before, or after any sale, to arrange and agree for the resale of any portion of the properties which it may decide to sell rather than to retain, to pledge or hypothecate all or any part of the securities deposited hereunder or which may come into the hands of the committee to carry out the said plan or any modification thereof or any plan adopted in substitution therefor, and to borrow money thereon for any purpose the committee may deem necessary, including the committee's expenses."

It also provided:

"The committee may create such liens upon any or all of the property so acquired by it as may be necessary in the discretion of the committee to carry out the plan and this agreement, or any part thereof, or to protect or develop the said property or any part thereof, or for any purpose the committee may deem wise or necessary."

And the plan in its concluding paragraph provided as follows:

"Moneys and securities coming into the hands of the committee may be used by it in its discretion to purchase debts of or claims against the company, for the payment of expenses of the court and committee, or for such other purchases as the said committee in its uncontrolled discretion may determine."

And in the concluding clause of the fourth paragraph of the agreement the committee was authorized—

"to pledge or hypothecate all or any part of the securities deposited hereunder, or which may come into the hands of the committee to carry out the said plan or any modification thereof."

The agreement also provided that the committee might—

"either personally or through any agent or court process or proceeding, by means of a receiver or receivers, or otherwise, take possession of the property and affairs of the company and manage and deal therewith as fully as either said company or the representatives of any securities deposited with or which may come into the hands of the committee might or could do in such other manner as in the premises may be permissible or proper. The committee may undertake the management of any corporation, and the property thereof, whose stock is owned or controlled by the company, or is covered by the mortgage securing the deposited bonds, or in any way comes into the possession or control of the committee, and may receive, dispose of, and vote upon the. shares of stock or other securities of any such corporation."

It also provided as follows:

"The committee may purchase all or any part of the property of the company at any private or public sale or sales, or at any sales held under or as the result of any judicial proceedings, and shall have full power and authority to fix the price to be paid or bid therefor, and in payment thereof may use and apply all or any part of the deposited securities, or any securities which may come into its hands, or any securities issued or to be issued by any corporation or corporations organized by or under the direction of the committee, or any moneys in the hands of the committee from whatsoever source derived."

It further provided:

"The committee may pay, settle, compromise, or purchase any debts of the company whenever and to the extent that it shall deem wise in carrying out said plan or this agreement, and for that purpose may use and apply any securities or moneys in its hands or under its control, from whatsoever source derived."

On March 21, 1908, the Alaska Company had authorized $2,500,-000 par value of its first mortgage 7 per cent. convertible gold bonds, the principal of which bonds became due in December, 1912, and was unpaid. Of these bonds there have been certified by the trustee $1,-615,000 par value. Approximately $766,000 par value of the bonds were sold and the proceeds turned into the treasury of the company, and about $622,000 par value of the bonds were out as collateral security in varying rations for moneys advanced.

The security and value of the bonds depended chiefly upon the value of the Ebner Gold Mining Company's property in Alaska, which value was unknown and could not be determined, except by exploration and development work estimated to require two years of time and $200,-000 of money, and if value should be proven it could not be extracted, except by an expenditure of additional money for plant equipment and working capital estimated at upwards of $2,000,000. The holders of the bonds were unable or unwilling to contribute, ratably or otherwise, sufficient money to prove the said property, or to develop the same if proved, or to create any value in the security of their bonds.

In this condition of affairs the committee on June 30, 1913, entered

into a contract with the Exploration Company by which it was agreed that the Exploration Company should enter upon the property of the Ebner Company, and do thereon certain exploration work and expend large sums of money in the uncontrolled discretion of the Exploration Company. The latter was to receive from the committee either the obligations of the committee or of subsidiary companies of the Alaska Company covering the advances made or to be made by the Exploration Company. The latter was to receive not only the full amount of its advances with interest in cash, but twice the amount of such advances with interest in bonds. In addition to such cash and bonds it was to receive stock of the new company to the amount of $5,500,000 par value, being all the stock of the proposed new company not required for the conversion of bonds.

On December 30, 1913, the committee and the Exploration Company entered into a supplemental contract. It recited that the committee had been unable to procure the acceptance and approval of its plan and agreement by 90 per cent. of the $1,505,000 par value of the bonds outstanding as called for in the original contract, but had secured such acceptance and approval by $840,500 par value of the bonds. It therefore amended the original contract in certain particulars and ratified and confirmed it as so modified. A clause was added which reads as follows:

"The Exploration Company agrees that upon the foreclosure sale referred to in article 2 of the original agreement, if the committee shall be the successful bidder at such sale, the Exploration Company will make available to the committee for turning in as part of the purchase price so to be paid by the committee for the property at foreclosure sale all of the Exploration Company's claims for advances to the extent and in the amount to which and at which the same shall have been allowed by the court as a preferred claim payable out of the proceeds of sale before any distribution is made to bondholders, provided that such turning in shall not change or prejudice or in any manner whatsoever affect the respective rights and obligations of the Exploration Company and of the committee under articles 5 and 8 of the original contract, the intent hereof being that the Exploration Company's preferred claim for such advances may be used as between the Exploration Company and the committee in lieu of cash payment of the purchase price at the foreclosure sale."

To secure the payment of the bonds the Alaska Company had executed a mortgage or deed of trust bearing date of December 5, 1907, in favor of the Guaranty Trust Company of New York City and one Edward M. F. Miller, as trustees, whereby it transferred to the trustees the property therein described as security for the payment of the bonds. The property covered by this mortgage included certain mining properties together with 100,000 shares of the stock of the Ebner Gold Mining Company, hereinafter called the Ebner Company, which stock had a par value of $5 per share and 1,000 shares of the stock of the Humboldt Mining Company, hereinafter called the Humboldt Company, which had a par value of $100 a share. The property of the Ebner Company and of the Humboldt Company was owned by the Alaska Company and consisted of certain mining lands and claims, in the territory of Alaska, believed to be of very great value. The Humboldt Company was a New Jersey corporation. Of the 100,-

000 shares of the stock of the Ebner Company, 31,920 shares were in the possession of the Guaranty Trust Company and 68,080 shares were subject to liens in favor of the committee.

The Alaska Company defaulted in the performance of its covenants under the mortgage and there was due and payable to the trustees the sum of $1,716,065.50. A decree of foreclosure and sale was entered on March 23, 1914. A special master was authorized to sell at public auction the property subject to the lien of the mortgage; and it was provided in the decree that accepted bidders should be entitled to turn in and apply in making payment of the purchase money bonds and coupons issued under the mortgage, and liens upon the stock of the Ebner Company and liens upon the property of the Alaska Company, and 10 per cent. of the purchase price was to be paid in cash.

The committee, acting under the plan and agreement of September, 1913, purchased the property at the foreclosure sale. The plan contained the following:

"The mortgage securing these bonds is being foreclosed, and it is the plan of your committee to purchase all or the greater portion of the property covered by said mortgage at foreclosure sale, provided a competitive cash bid sufficient to pay off the bonds is not received. If such property is purchased by the committee, it is proposed to organize a new company and to vest in it the ownership and control of all the property of the company which your committee may acquire at foreclosure sale or otherwise, free and clear except for a prior lien of not exceeding $300,000 to be created by the committee and covering such cash as may have been expended to acquire underlying liens and for exploration work."

And on April 22, 1914, the special master sold at public auction the property embraced in the mortgage. It was purchased by the committee for the sum of $225,000, that being the highest bid submitted. The sale was closed on May 21, 1914. The special master received in cash $43,879.93 and liens to the amount of $170,072.70 were turned in to him and which he was authorized to receive under the decree of foreclosure. The committee was enabled to make this purchase because of an agreement made with the defendant whereby the latter turned over to it the underlying liens and the 68,000-odd shares of Ebner stock which secured those liens, and which the committee then turned in on account of the purchase price. The defendant also paid to the master for account of the committee the cash required to make up the balance of its bid. The entire amount of cash and liens in the purchase were furnished by the defendant. The committee forthwith turned back to defendant the shares of the Ebner Company's stock and the shares of the Humboldt Company's stock by way of security and at the same time gave its note to defendant in the sum of $230,-706.32, with interest at 6 per cent. per annum. The note was to mature on November 20, 1914.

The note for $230,706.32 not having been paid at maturity the Exploration Company sold on April 7, 1915, the securities turned over to it by the committee. The sale was made, not only to satisfy that note, but other obligations which the Exploration Company claimed to be owing to it from the committee, and which it was asserted amounted to $408,921.13.

This suit was begun in April, 1915, the complainants asking the following relief:

"That said agreement of June 30, 1913, and supplemental agreement of December 30, 1913, be adjudged usurious and void and canceled. That the Exploration Company be decreed to surrender the 100,000 shares of stock of the Ebner Company and 1,000 shares of stock of the Humboldt Company to a receiver to be appointed by the court for the benefit of the complainants and such other depositing bondholders as make themselves parties to this suit. That the Exploration Company, its officers, agents, servants, and attorneys, be forever enjoined from selling or offering to sell, assigning, transferring, incumbering, or otherwise disposing of the 100,000 shares of stock of the Ebner Company and 1,000' shares of stock of the Humboldt Company received by it from the other defendants as pretended security for the obligations of said alleged contracts of June 30, 1913, and December 30, 1913, or for any advances made thereunder. That pending the suit a'receiver or receivers be appointed, with the usual powers and duties of receivers in like cases, of said shares of stock. That complainants may have their costs of this suit and such other and further relief in the premises as the nature of the case may require."

On January 24, 1916, the District Court filed a carefully prepared opinion the main features of which are as follows: (1) It adjudged the contracts of June 30, 1913, and of December 30, 1913, void. (2) It adjudged the title of the stocks in controversy to be the property of the committee in their representative capacity, subject to the lien of the Exploration Company. (3) It adjudged that the stocks are subject to a valid existing lien of $170,072.70. (4) It provided for the ascertainment by the court or a master of the additional amount due, for which amount the Exploration Company will have a lien on the stocks. (5) It restrained the Exploration Company from selling or in any manner disposing of or pledging the stocks in question, until the further order of the court, and required that they be placed in the custody of the court. (6) It provided for a lien to such further amount as the Exploration Company may expend subject to to the order of the court, to protect the physical property while the provisions of the decree are being carried out. (7) It dismissed the complaint against the individual defendants, because no relief has been asked of them and no proof adduced in this suit warranting a decree against them. The individual members of the committee had been joined with the Exploration Company as parties defendant to this suit. (8) It proved for the further details indicated in its opinion.

On March 6, 1916, an interlocutory decree was entered in this suit adjudging that the contract of June 30, 1913, between the committee and the Alaska Company and the supplemental contract of December 30, 1913, were void and of no effect. The decree also adjudged that the foreclosure sale by defendant of 100,000 shares of the stock of the Ebner Company and of the 1,000 shares of the stock of the Humboldt Company on April 7, 1915, and the purchase of such shares by the defendant at such sale were without warrant or authority in law, and that the defendant did not thereby acquire any lawful title thereto, but the title remained in the committee in trust for the benefit of the complainants, subject, however, to certain liens.

The court held the sale invalid for the reason that the Exploration

Company sold the collateral to satisfy debts it alleged to be due from the committee in the sum of $408,921.13, whereas it only had a right to sell for $213,952.63; everything beyond that sum being in the opinion of the court an unliquidated demand. The note for $230,-952.63 was only valid to the extent of $213,952.63, that being the amount of the liens, $170,072.70, and the cash, $43,879.93, turned in by the Exploration Company to the credit of the committee upon the latter's purchase at the time of the foreclosure of the Guaranty Trust Company's mortgage. The court held that the Exploration Company was without power to sell the collateral to satisfy a debt greater than at the time of the sale had been actually fixed and was then actually due. The difference between the $408,921.13 claimed and $213,952.63 covered ·by the note represented an unliquidated debt, to satisfy which the right to sell the collateral did not exist.

It was also adjudged that the aforesaid shares of stock are subject to a valid subsisting lien in favor of the defendant for the sum of $213,952.63 with interest from May 21, 1914, to April 7, 1915, and a valid subsisting additional lien on the said shares for such further sum of money as should be established to the satisfaction of the court to have been expended by defendant in addition to the aforesaid sum of $213,952.63 for expenses of exploration, protection, and development of the properties of the Ebner Company, including its water rights and its expenditures at the request and for the account of the committee in connection with foreclosure and receivership proceedings in the jurisdiction of the Southern district of New York and in the jurisdiction of Alaska down to the date of the entry of the decree.

It was also adjudged that the defendant deposit with the clerk of the District Court the shares of stock involved, which were to be held subject to the further order of the court. It was also ordered that if, on or before May 15, 1916, the complainants had not paid to the defendant the full amount then due, they might apply for an extension for a period not longer than June 30, 1916, and the defendant might at any time thereafter, on five days' notice to the complainants or their attorneys, apply for leave to sell the stock at public auction to satisfy its lien or liens, debt or debts.

Certain others matters were provided for in that decree which need not here be referred to, as they are not involved in this appeal.

On June 13, 1916, another interlocutory decree was entered, which adjudged that the amount of the defendant's lien which the shares ·of stock were subject to amounted to the sum of $438,926.98, with interest thereon from March 6, 1916. It also adjudged that if the shares should be sold to satisfy the lien, as provided in the former decree, they should be sold subject to a further lien in favor of the defendant for the amount which should hereafter be determined by the court to be due for expenses incurred by the defendant with the approval of the court after the entry of the decree of March 6, 1913, in protecting and preserving the properties of the Ebner Company, which expenses were not to exceed $4,000 per month.

On August 4, 1916, the complainants not having paid to the defendant the amount they were directed to pay under the prior decree,

another decree was entered directing the special master to sell the shares of stock herein involved on October 18, 1916, at public auction, and determining the conditions of sale. From this order the complainants have appealed to this court, and also brought up for review so much of the decree of March 6, 1916, as refused to adjudge that the contracts of June 30 and December 30, 1913, are void for usury, and as adjudged that the defendant is entitled to a lien.

[1] This makes it necessary, to determine whether there was a loan; for, if the real transaction was a loan, it would be the imperative duty of this court to declare the agreement void as providing for a usurious return for its money. Counsel for the complainants say in their brief in this court:

"With all respect for the learned court below and for our opponents, to hold that there are not here all the elements of a loan is a legal absurdity."

In Nichols v. Fearson, 7 Pet. 103, 8 L. Ed. 623 (1833), the Supreme Court declared that there were two cardinal rules in the doctrine of usury. The first of these is one with which we are now concerned:

"The first is that to constitute usury there must be a loan in contemplation by the parties."

And in order to constitute a loan there must be a thing loaned, a lender, and a borrower. A loan involves the delivery of a thing loaned by one party, who lends, to another party, who borrows, under an agreement to return the thing so delivered, or its equivalent. The thing loaned may be with or without reward, as the parties may agree; but in all events the thing loaned, or its equivalent, is to be returned. The record does not disclose any such agreement in this case. The Exploration Company did two things: (1) It purchased certain claims against the Alaska Company to keep the property together. (2) It undertook through its engineering corps to explore certain mining properties at its own expense. Neither of these things involved a loan. There was no borrowing and no lending.

There was a distinct refusal on the part of the Exploration Company to make a loan. The committee in the first instance sought a loan from the Exploration Company, which was refused. The representative of the Exploration Company testified that the chairman of the committee came to him and said that they wanted to borrow money to take up the liens and preserve the equity in the property for the bondholders. He also said that the bondholders' committee needed to have an exploration of the physical property in Alaska, to find out whether or not there was a mine there, that they had no available means with which to prosecute the investigation, and that they would like to borrow from the Exploration Company enough money to find that thing out. The reply to this application was as follows:

"I told him that was not an attractive lay out; that the Smelting Company or the Exploration Company was not lending money; what he was talking about was a banking proposition; that the Exploration Company did know the property, the Ebner property, in Alaska by report, and had a notion that it might be a gold mine; and that it would be entirely willing to spend up to a couple of hundred thousand dollars to find out whether or not there was a

gold mine there, provided·he could find anybody in existence anywhere with whom we might contract, so that, if the exploration developed value, we might be assured of getting the property on such terms as we might arrange. * * * Chapman said what he wanted was to borrow the estimated cost price of this exploration work for the Chapman committee, and go ahead and do the work, and when they got through, if they found value there, they would offer it to the Exploration Company, or to the Smelting Company, on some fair terms, and then it would be arranged. I told him that it would be absolutely unsatisfactory; that the result of that would be that for a mere loan and repayment of it our money would develop perhaps a very great value in the equity of the property, which we had no hold on, and which the bondholders would take and run off with for their own benefit, and we would get nothing, except on terms dictated by·them; but that, if he would tie up the disposition of the final equity in that property, so that we could have it on terms that we were willing to set down right there and dicker with him on, we would like to go ahead, and would put up the money for the exploration, and we would make that and other necessary disbursements, and when we got through, if we found value, we would organize a new company on the basis that we might then agree with him on. I told him that the only trade we would consider would be that, if our exploration developed value worth going on with, we should get all of our disbursements back, everything we had spent on the property, and we should get also the entire property, lock, stock, and barrel, giving a good bond for a bad bond to the old Ebner bondholders. That was rather grumblingly conceded after a while. * * * I prepared the ´contract, which later was signed as the contract of June 30th, and sent it over to Mr. ´Chapman."

It is impossible to read the contract these parties entered into and spell out of it a loan. The Exploration Company had no intention of loaning money. The money now said to have been loaned was not turned over to the committee, but was expended by the Exploration Company itself, and in its own interest, and not for the bondholders. The money expended was at the hazard of the undertaking; there being no liability on the part of any one to reimburse the Exploration Company for the money expended by it. If the property is sufficient to satisfy the Exploration Company's lien for principal and interest, well and good; and, if it is not, no one is primarily liable for repayment.

[2] We come now to the second question which this appeal presents, that relating to the liens. The complainants insist that the defendant should be required to restore to them the shares of stock in both the Ebner and the Humboldt companies, free from any lien or claim whatever. The committee had authority under the plan and agreement of September, 1913, to create such liens as in its discretion it thought necessary to carry out "the plan and this agreement," and "to protect or develop" the property, or any part thereof. The provisions giving it authority to create the liens have been set forth in an earlier portion of this opinion. In the face of these provisions we are at a loss to understand how it can be seriously claimed that the committee was without power to create the liens. That it had the power to create them, and that it rightly exercised that power, is evident. It was authorized to procure the purchase of the underlying liens.

The committee was also authorized to use or expend moneys "in operating, completing, improving, or otherwise, the plant of the company, or making the business thereof effective prior" to the proposed reorganization. It had authority to contract for the expenditure of such

sums as might be necessary and proper to explore, protect, or develop the property. Expenditures incurred to determine the presence or non-presence of ore in paying quantities in a given mining area is necessary and proper work and within the express authority conferred upon the committee. And in doing this it had authority to give a lien for the expenses thus incurred.

The defendant's statement of its expenditures as originally presented amounted to $537,931.65. But the court disallowed $99,004.67 and allowed $438,926.98. The amount thus allowed is made up as follows: (1) Liens owned by the Exploration Company on May 21, 1914, when the foreclosure sale was consummated and the property turned over to the Chapman committee, and the liens were turned over as part payment of the purchase price to the amount of $170,072.70, together with $43,879.93, which the Exploration Company turned over as cash to be also applied on the purchase price. This aggregated $213,952.63. The interest on this amount from May 21, 1914, to the entry of the interlocutory decree amounted to $11,303.82. This made a total of $225,-256.45. (2) The expense of exploration and development work done for the Chapman committee after it took title at foreclosure sale, May 21, 1914, and which amounted to $184,069.14. (3) The money advanced by the Exploration Company to defray the expenses incurred by the committee in the settlement of the ancillary receivership in Alaska, in the payment of counsel in charge of litigation in Alaska where a number of cases were pending including the important case of Alaska-Juneau v. Alaska-Ebner, Mackey et al., which involved the water rights on the Ebner mines. The amount of these expenses as allowed aggregated $29,601.39.

It does not appear that any errors were committed by the District Court in determining the amount of the liens. The only item among those allowed which the complainants' counsel specifically attack is the allowance of the liens of H. W. Martin. It is said the committee had no power to incur any obligations as to him. It is true the committee did not employ Martin to do any work on the mining properties. The contract with him was made by the receivers, acting under the orders of the District Judge. That contract provided as follows:

"The receivers agree * * * that they will deliver and pledge to said Martin forthwith, upon the surrender thereof, as hereinbefore provided, all of the preferred, or underlying claims, stock, and securities of every kind which he now holds as security for his said advances, which said claims, stock, and securities are to be security for the said receivers' certificates pursuant to the order of the United States District Court for the Southern District of New York, dated May 21, 1913; and of such stock, the stock in the Ebner Gold Mining Company to be transferred, so soon as practicable, into the name of the receivers, who shall indorse in blank the certificates therefor, or powers for the transfer thereof, but shall retain the voting power thereon, as provided in said order."

The existence of the Martin liens was established by the decree of foreclosure and sale of the mortgage to the Guaranty Trust Company, entered March 23, 1914. That decree mentions certain liens in favor of Martin in certain specified amounts and then adds:

"All amounts of money, with interest, paid out and advanced by said H. W. Martin or on his account pursuant to said contract of May 27, 1913, on

or after November 1, 1913, and up to and including the date of sale herein, which amounts were undetermined at the time of filing said special master's report, but which were therein declared to be prior and superior to the lien of the said mortgage."

The Martin liens being superior to the lien of the mortgage, the committee, in acquiring title at the sale, acquired it subject to those liens, and the objection raised is without merit.

[3] Counsel for complainants urged upon this court that the most favorable view which can be taken of the defendant's position is that it should be assimilated to that of an occupant of land, who, under a mistaken claim of title, has made improvements in good faith at his own cost. In such a case the rightful owner, who comes into equity for relief, must as a condition of his relief do equity by reimbursing to the defendant such sums as were expended in improvements so far as they had increased the value of the land. Applying that doctrine to the facts of this case, they would have this court decide that the bondholders who bring this suit can only be asked to reimburse the Exploration Company to the extent that it has added to the permanent value of this property by the expenditures which it has made. While counsel claim that this is the most favorable view which can possibly be taken of the defendant's position, they are far from conceding that the defendant is entitled even to so much consideration as that would involve; for they deny defendant's good faith and point out that it was fully cognizant of the powers of the committee with whom it dealt. It is sufficient to say that the principle invoked is inapplicable to the facts of this case. The committee, as we have pointed out, had the right to obligate itself for the expenditure of such sums as might be necessary and proper to explore, protect, or develop the property.

We see no reason to believe that the Exploration Company did not act in entire good faith. We fail to find evidence in this record that it made reckless or ill-advised expenditures.

Decree affirmed.